**The court incorporates by reference in this paragraph and adopts as the findings and analysis of this court the document set forth below. This document has been entered electronically in the record of the United States Bankruptcy Court for the Northern District of Ohio.**



_Mary Ann Whipple_
United States Bankruptcy Judge

**Dated: June 22 2007**

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Case No. 06-30261 |
| | ) | |
| Louie W. Smith and | ) | Chapter 7 |
| Denise Y. Smith, | ) | |
| | ) | |
| Debtors. | ) | JUDGE MARY ANN WHIPPLE |

### MEMORANDUM OF DECISION  DENYING MOTION TO DISMISS

This case is before the court on the motion to dismiss for abuse brought under 11 U.S.C. § 707(b)(2) and (b)(3) by the United States Trustee ("the UST"). [Doc. # 33]. The court held a hearing on the motion that Debtors, their attorney and the attorney for the UST attended in person. At the hearing, the parties had the opportunity to, and did, present testimony and documentary evidence in support of their respective positions.

The court has jurisdiction over this case under 28 U.S.C. §1334(b) and the general order of reference entered in this district. The motion to dismiss is a core proceeding that the court may hear and decide. 28 U.S.C. § 157(b)(1) and (b)(2)(A) and (O). For the reasons that follow, the court will deny the UST's motion.

### BACKGROUND

Debtors are married and have no dependents. Louie Smith is a carpenter and has been self-employed since 1995. Denise Smith is employed as a supervisor at Northwest Ohio Developmental Center, where she has worked for 28 years. On February 28, 2006, they filed a joint petition for relief under Chapter 7 of the Bankruptcy Code. Their petition states that their debts are primarily consumer debts. Debtors' bankruptcy

schedules show unsecured priority debt in the amount of $58,800, consisting entirely of debt owed for income taxes for the years 2002 through 2004, and unsecured nonpriority debt in the amount of $165,472.[1]

On their bankruptcy schedules, Debtors list personal property that includes two motor vehicles, a 1998 Subaru and a 2001 Ford Econoline van, valued at $4,200 and $6,500, respectively. On their Schedule D, Debtors list two individual family members as holding security interests in the vehicles. However, at the hearing, Louie Smith ("Smith") testified that his son-in-law loaned him $8,400 to purchase the Ford van at the expiration of the vehicle's lease agreement in late February 2006 but that his son-in-law does not have a lien on the vehicle. Similarly, he testified that Debtors borrowed $5,500 from Smith's retired father in September 2005 in order to purchase the Subaru but that his father does not have a lien on that vehicle.

On their Schedule I, Debtors report combined net monthly income of $4,675. Specifically, Debtors report gross monthly wages of Denise Smith in the amount of $3,560 and payroll deductions relating to her wages in the amount of $877, which amount includes $469 for taxes and social security, for net monthly income of $2,683. They also report $1,992 as regular income from the operation of Smith's carpentry business. Debtors explain on Schedule I that, in 2005, Smith had gross income as a carpenter of $42,031 and expected business expenses and taxes of $18,128, for net annual income of $23,903 or $1,992 per month. At the time Debtors filed their petition, they had not yet completed their 2005 income tax returns. At the hearing, Smith offered testimony on direct and cross examination, which the court finds to be credible, further explaining the calculation of his income and his bookkeeping practices.

Smith testified that he has no employees and that he maintains the financial records of his unincorporated carpentry business. He and his wife each have separate checking accounts. Smith has one checking account that he uses for both his personal and business affairs. All business receipts are deposited into his checking account and he maintains purchase orders relating to each job. From this information, he calculated his gross income less material, labor and other expenses directly attributable to the purchase orders relating to that income for each month of a six-month period between August 2005 and January 2006. [*See* Gov't Exh. 8]. His total income less material, labor and other expenses directly attributable to the specific purchase orders relating to that income for the six-month period is $20,502, or $3,417 per month on average. Smith also testified that, having then completed his 2005 income tax return, he reported annual expenses in the amount of $11,882 on Schedule C of his return, which included a vehicle expense of $3,000, office expense of $500, lease expense for vehicle and equipment of $5,232, and an insurance expense of

---

[1] On Schedule D, Debtors list an additional $45,852 as the unsecured portion of debt owed to secured creditors that relates to loans on a home that was foreclosed in 2003 and a vehicle that was repossessed in 2004.

$1,600.[2]  These are additional expenses that do not appear on the purchase orders because they are not attributable to a particular job but that yield an average monthly additional expense amount of $990. Finally, Smith testified that his tax liability for 2005 was $6,640, or an average of $553 per month.  Using these figures, Smith's monthly income less expenses attributable to the purchase orders relating to that income of $3,417, less additional expenses of $990, less taxes of $553, totals $1,874, a figure that is very close to his estimated income reported on Schedule I and a figure the court finds is a more accurate average of his monthly income.

The UST offered the testimony of Christopher Sonson, a bankruptcy analyst with the UST's office, that Smith understated his net income by approximately $1,400 per month.  He testified that he based this conclusion primarily on Smith's affidavit [Gov't Exh. 8], wherein he sets forth his income less expenses attributable to the purchase orders relating to that income that he earned in each month from August 2005 through January 2006.  However, as explained above, the figures set forth in the affidavit do not include the additional monthly expenses of $990 that are not directly attributable to the purchase orders relating to the income reported, nor do they include Smith's average income tax expense of $553 per month. While it is also true that the deposits to Smith's checking account during the approximately six-month period before filing his petition were greater than the gross amount of deposits he reported as attributable to his business income, Smith reasonably explained this difference as money that was redeposited after having been withdrawn, deposits from his wife's checking account in order to pay bills,  and, in at least one instance, money that was deposited after being reimbursed for building materials purchased by Smith for a family member.  While Smith's bookkeeping methods leave something to be desired, the court finds his testimony credible.

On their Schedule J, Debtors list total monthly expenses of $4,874, including $900 for installment payments on the unsecured loans owed to family members that were used to purchase the Ford and the Subaru, resulting in Debtors reporting monthly income after expenses of negative $199.  At the hearing, Smith testified that the agreement with his son-in-law to repay the $8,400 borrowed to purchase the Ford van was "to pay as much as possible as soon as possible."  Smith further testified that he owed his father approximately $2,500 on the loan used to purchase the Subaru and that his agreement was to pay monthly "whatever he could."  Debtors' Statement of Intention indicates that they intend to reaffirm both of these debts.

---

[2]  Neither party, both of whom had a copy of Debtors' Schedule C from their income tax return, offered the document for admission into evidence at the hearing.

As required under the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Debtors also completed and filed with their petition Official Form B22A, Statement of Current Monthly Income and Means Test Calculation. They report total current monthly income ("CMI"), as that term is defined in 11 U.S.C. § 101(10A), in the amount of $5,552, which is above the median family income for a family of two in Ohio. The total income reported includes $3,560 gross wages of Denise Smith and business income of Louie Smith in the amount of $1,992, based on the same calculations used on Debtors' Schedule J. Debtors' means test calculation includes monthly deductions totaling $6,285, which include, among other things, deductions in the amount of $331 and $270 for an ownership expense with respect to the Ford and the Subaru, deductions in the amount of $140 and $62 for payments on secured claims, indicating that the Ford and the Subaru secure the debts owed on those claims, and a deduction for taxes in the amount of $1,094. Thus, Debtors report on their Form B22A a negative $733 monthly disposable income and indicate that a presumption of abuse under § 707(b)(2) does not arise.

The UST argues that a presumption of abuse arises, contending that Debtors have not properly calculated Smith's income and have not properly calculated their permitted deductions under the means test. The UST maintains that neither Smith's gross receipts nor his business expenses are accurately reported, that deductions are not permitted for payments on secured debt since neither vehicle is encumbered by a lien, and that deductions for vehicle ownership expenses are not permitted since Debtors own the vehicles free and clear of any liens.[3] The UST also argues that Debtors' lack of honesty and the totality of the circumstances demonstrate abuse.

## LAW AND ANALYSIS

As amended by BAPCPA, § 707(b)(1) provides that the court, after notice and a hearing, "may dismiss a case filed by an individual debtor under [Chapter 7] whose debts are primarily consumer debts ... if it finds that the granting of relief would be an abuse of the provisions of [Chapter 7]." Under § 707(b)(2) and (3), Congress provided two methods by which a party may prove abuse. Section 707(b)(2)(A) sets forth an extensive "means test" calculation to determine whether there is a presumption of abuse. The means test calculation requires a debtor to calculate CMI and then, if the debtor is above the median income for the given state and family size, to subtract certain allowed deductions from the debtor's CMI. Where the means test calculation results in sufficient disposable income such that a presumption of abuse arises

---

[3] The UST also argued in his motion filed with the court that Debtors' deduction on line 32 of Form B22A under "Other Necessary Expenses: telecommunication services" is excessive as not being necessary for their health and welfare. This argument, however, was not pursued at the hearing and the court considers it abandoned.

4

under the statute, a debtor may rebut that presumption by demonstrating "special circumstances" as set forth in § 707(b)(2)(B). However, even if the presumption is rebutted or if no presumption arises in the first place, the court may still dismiss a case for abuse under § 707(b)(3), which directs the court to consider in any determination of abuse under § 707(b)(1) whether (A) the debtor filed the petition in bad faith or (B) "the totality of the circumstances . . . of the debtor's financial situation demonstrates abuse."

In this case, while, as discussed below, Debtors' means test calculations are not without errors, in the end, the court finds that no presumption of abuse arises and that the totality of the circumstances does not demonstrate that the granting of relief would be an abuse of the provisions of Chapter 7.

## I. Smith's CMI

The UST argues that Debtors have understated Smith's gross business receipts reported on line 4(a) of Form B22A and have overstated his business expenses reported on line 4(b). Debtors obtained the $3,503 figure on line 4(a) from Smith's estimate of income for 2005 in the amount of $42,031 as reported on their Schedule I ($42,031 ÷ 12). Debtor's testimony made clear that what he referred to as gross income of $42,031 and gross monthly receipts of $3,503 included netting out of expenses specifically attributable to the purchase orders relating to that income. Although such expenses are more properly included in business expenses reported on line 4(b), Debtors did not include those expenses on line 4(b). Thus, Debtors' method of reporting gross receipts does not distort his CMI. Although Debtors report receipts of $3,503 as estimated at the time of filing, as the court earlier found, the more accurate figure after having completed his 2005 income tax return is $3,417. And for the reasons discussed earlier in this opinion, the court rejects the UST's argument that gross receipts are understated based on the fact that the total deposits to Smith's checking account during the relevant time period were greater than the deposits he reported as attributable to his business income.

The court agrees, however, that Smith's business expenses reported in the amount of $1,511 on line 4(b) are overstated. Debtors obtained the $1,511 figure from Smith's estimate of business expenses and taxes for 2005 in the amount of $18,128 ($18,128 ÷ 12), the same calculations he used in reporting his income on Schedule I. However, on Form B22A, income tax expenses, along with social security and Medicare taxes, are reported separately on line 25 as a category under "Other Necessary Expenses." They are not properly included as a business expense on line 4(b) since the CMI calculation is of gross income, or income before taxes. In fact, Debtors reported a tax expense on line 25 of $1,094. As Denise Smith's monthly payroll taxes and social security, as reported on Debtors' Schedule I, totals only $469, it appears clear that Smith's estimated income tax expense is already included on line 25. As discussed above, Smith's

5

2005 Schedule C business expenses were $11,882, resulting in a monthly business expense of $990. Thus, Smith's business income reported on line 4(c) equals gross receipts of $3,417 less business expenses of $990, or $2,427, which is $435 more than what is reported on Debtors' Form B22A.

## II. Deductions for Secured Debt

A debtor is entitled to a deduction from CMI equal to his "average monthly payments on account of secured debts. . . ." 11 U.S.C. § 707(b)(2)(A)(iii). Debtors included deductions under this provision on Line 42 of their Form B22A in the amounts of $140 for secured debt payment on the 2001 Ford van and $62 for secured debt payment on the 1998 Subaru, for a total of $202. Smith testified, however, that while Debtors incurred the debts in order to purchase the vehicles, the debts are not secured by a lien on the vehicles. As such, Debtors are not entitled to any deduction for payments on secured debt.

## III. Deductions for Vehicle Ownership Expense

The UST also argues that Debtors' means test calculations are wrong because they include on Lines 23 ans 24 of their Form B22A ownership expense deductions for their two vehicles that they own free and clear of any liens. As is relevant here, in performing the means test calculations, Congress specified the monthly expenses that are to be deducted from CMI:

> The debtor's monthly expenses shall be the debtor's applicable monthly expense amounts specified under the National Standards and Local Standards, and the debtor's actual monthly expenses for the categories specified as Other Necessary Expenses issued by the Internal Revenue Service for the area in which the debtor resides. . . .

11 U.S.C. § 707(b)(2)(A)(ii)(I).

The Standards referred to in this section are the Collection Financial Standards used by Internal Revenue Service ("IRS") to determine a taxpayer's ability to pay a delinquent tax liability. The Financial Analysis Handbook found in the Internal Revenue Manual ("IRM") explains that these Standards are contained in tables that are web-based and directs the individual to the web address at which they can be found. http://www.irs.gov/irm/part5/ch15s01.html#d0e181662 ("Fin'l Analysis Handbook"), Exh. 5.15.1-2. The National Standards, based on gross monthly income and family size, set forth amounts for five categories of expenses: food, housekeeping supplies, apparel and services, personal care products and services and miscellaneous. The Local Standards include housing and utility expenses that are based on family size and location, and transportation expenses. The transportation standards include "Ownership Costs," which consists of amounts applied nationwide based on the number of cars owned by the individual, and "Operating Costs & Public Transportation," which are also based on the number of cars owned by the individual as well as the individual's location.

6

The issue presented by the UST is whether a debtor who owns a vehicle free and clear of any liens is entitled to the vehicle ownership expense deduction set forth in the IRS standards. There is an almost even split of authority by courts in no less than sixteen districts that have so far addressed in writing the circumstances under which the ownership expense deduction may be taken. On one side of the argument are courts that deny the ownership expense deduction where the debtor has no car loan or lease payments. In so holding, most of these courts rely on the IRS guidelines for applying the Standards found in the Internal Revenue Manual. Because the IRS guidelines state that the expense allowance is permitted only if the taxpayer is making loan or lease payments, *see* Fin'l Analysis Handbook, ¶¶ 5.15.1.9(B) and 5.15.1.7, these courts have concluded that a debtor who makes no loan or lease payments is not entitled to the ownership deduction. *See In re Pampas*, Case No. 06-10936, 2007 WL 1485352, 2007 Bankr. LEXIS 1741 (Bankr. M.D. La. May 21, 2007); *In re Slusher*, 359 B.R. 290 (Bankr. D. Nev. 2007); *In re Carlin*, 348 B.R. 795 (Bankr. D. Or. 2006); *In re McGuire*, 342 B.R. 608 (Bankr. W.D. Miss. 2006); *In re Harris*, 353 B.R. 304 (Bankr. E.D. Okla. 2006); *In re Hardacre*, 338 B.R. 718 (Bankr. N.D. Texas 2006). Other courts rely solely on the statute's provision that "debtor's monthly expenses shall be the debtor's *applicable* monthly expense amounts specified" under the Standards and conclude that in order to take the deduction a debtor must first have an *applicable* ownership expense (i.e. a loan or lease payment). *See In re Ross-Tousey*, Case No. 07-C-65, 2007 WL 1466647, *3, 2007 U.S. Dist. LEXIS 36836 (E.D. Wis. May 21, 2007) (finding that the debtor must have "*some* expense in the first place before the Standard amount becomes applicable"); *In re Wiggs*, Case No. 06 B 70203, 2006 WL 2246432, 2006 Bankr. LEXIS 1547 (Bankr. N.D. Ill. Aug. 4, 2006) (finding that the term "applicable" would otherwise be "superfluous"); *In re Ceasar*, Case No. 06-20355, 2007 WL 777821, *5, 2007 Bankr. LEXIS 829, *14 (stating the contrary view gives "little or no weight" to the term "applicable" which it finds is a "critical qualifier"). One court explained:

> Had Congress intended to indiscriminately allow all expense amounts specified in the National and Local Standards, it would have written 707(b)(2)(A)(ii)(I) to read, "The debtor's monthly expenses shall be the monthly expense amounts specified under the National Standards and Local Standards . . ." rather than "The debtor's monthly expenses shall be *the debtor's applicable* monthly expense amounts specified under the National and Local Standards . . . ."

*In re Slusher*, 359 B.R. at 309.

On the other side of the argument are courts that permit a debtor to take the ownership expense deduction even if the debtor has no car loan or lease payment. *See In re Chamberlain*, Case No. 2:06-bk-01774-RJH, 2007 WL 1355894, 2007 Bankr. LEXIS 1529 (Bankr. D. Ariz. April 26, 2007); *In re Enright*, Case No. 06-10747, 2007 WL 748432, 2007 Bankr. LEXIS 812 (Bankr. M.D.N.C. March 6, 2007); *In re*

*Sawdy*, 362 B.R. 898 (Bankr. E.D. Wisc. 2007); *In re Zak*, 361 B.R. 481 (Bankr. N.D. Ohio 2007); *In re Billie,* Case No. 06-12942, 2007 WL 1174132, 2007 Bankr. LEXIS 1306 (Bankr. N.D. Ohio Apr. 10, 2007); *In re McIvor*, Case No. 06-42566, 2006 WL 3949172, 2006 Bankr. LEXIS 3861 (Bankr. E.D. Mich. Nov. 15, 2006); *In re Haley*, 354 B.R. 340 (Bankr. D.N.H. 2006); *In re Hartwick*, 352 B.R. 867 (Bankr. D. Minn. 2006); *In re Fowler*, 349 B.R. 414 (Bankr. D. Del. 2006); *see also In re Farrar-Johnson*, 353 B.R. 224 (Bankr. N.D. Ill. 2006) (permitting the standard housing expense deduction, notwithstanding the fact that debtors lived in military housing and had no actual housing expense). These courts do not consider the IRS guidelines in their interpretation of § 707(b)(2)(A)(ii)(I). They reason that the plain language of the statute provides an objective expense deduction regardless of whether the debtor owes a debt for the vehicle. *See, e.g., In re Fowler*, 349 B.R. at 420; *In re Hartwick*, 352 B.R. at 869. For the following reasons, this court finds this line of reasoning persuasive.

### A.  Plain Language of § 707(b)(2)(A)(ii)(I)

The starting point in interpreting any statute is the language of the statute itself. *Duncan v. Walker*, 533 U.S. 167, 172 (2001). "When the statute's language is plain, the sole function of the courts--at least where the disposition required by the text is not absurd--is to enforce it according to its terms." *Id.* (quoting *United States v. Ron Pair Enterprises*, Inc., 489 U.S. 235, 241 (1989)). However, in the "'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters' . . . the intention of the drafters, rather than the strict language, controls." *Ron Pair Enterprises, Inc.*,  489 U.S. at 242-43 (internal citations omitted).

The relevant statute provides:

> The debtor's monthly expenses shall be the debtor's applicable monthly expense amounts specified under the National Standards and Local Standards, and the debtor's actual monthly expenses for the categories specified as Other Necessary Expenses issued by the Internal Revenue Service for the area in which the debtor resides. . . .

11 U.S.C. § 707(b)(2)(A)(ii)(I). Courts on both sides of the argument agree that the statute provides an objective vehicle ownership expense deduction in the amount specified under the IRS Standards if a debtor is making a car loan or lease payment even when the actual payment is less than the Standard amount. *See e.g., In re McGuire*, 342 B.R. at 613 (denying the deduction because the debtor had no loan or lease payments but explaining that if the debtor is actually incurring expenses for the purchase or lease of a vehicle "then because the monthly ownership amount 'shall be' the 'amount specified' in the Standards, [the statute] mandates that the debtor is permitted to claim an expense deduction for the full Standard amount"); *In re Hartwick*, 349 B.R. at 869 (agreeing with this general proposition and finding that a reading of the

8

statute "does not change where the actual expense is 0").  Such an interpretation necessarily results from the use of "*applicable* monthly expense amounts specified under the National Standards and Local Standards" and  "debtor's *actual* monthly expenses for the categories specified as Other Necessary Expenses" in the same sentence.   This language shows that Congress did not intend that "*applicable* monthly expense amounts" for vehicle ownership expenses set forth under the Local Standards be the same as the debtor's actual ownership expenses.   While there is little or no dispute regarding that general proposition, the question remains – what does *applicable* refer to in the phrase "*applicable* monthly expense amounts"?     As one court observed, "applicable," read in isolation and defined as "That can be applied; appropriate," may be ambiguous in that "an expense could be 'appropriate' for a debtor to claim because he actually incurs that expense" or, instead, "because he lives in a certain state and county and has a household of a certain size, putting him in the right box on the Local [or National] Standards chart."  *In re Farrar-Johnson*, 353 B.R. at 230 (citing *American Heritage Dictionary* 89 (3rd ed. 1996)).  However, the words of a statute are not read in isolation; they must be read in the context in which the word appears.  *Id.*; *see OfficeMax, Inc. v. United States*, 428 F.3d 583, 592 (6th Cir. 2005) ("the question whether a statute is ambiguous arises after, not before, a court applies traditional canons of interpretation, the most important here being the context in which the word appears").   The court finds that the structure of the statutory sentence at issue supports only one interpretation.

Because the "amounts specified" under the National and Local Standards are monthly expense amounts, the statute describes the amounts that "shall be" included in a debtor's monthly expenses as "monthly expense amounts."   "Monthly expense" modifies amounts.  However, a further description is necessary since the National and Local Standards include multiple monthly expense amounts.  For example, the National Standards for food, clothing, housekeeping supplies, personal care and miscellaneous expenses, are specified according to gross monthly income and number of persons in the debtor's household.  Thus, a debtor must choose the "applicable" amount specified from the tables.  The Local Standards for housing and utility expenses are specified by state, county and family size.  Again, a debtor must choose the "applicable" amount specified.  Transportation expenses are divided into two categories: operating costs and public transportation, and ownership expenses.  The Local Standards for operating costs and public transportation expenses are specified according to number of cars and the Census Bureau region and, if applicable, the specific city, in which the debtor lives.  Finally, the vehicle ownership expense is an amount applied  nationwide that is specified by number of cars.  Once again, a debtor must choose the "applicable" amount specified.  Thus, in every instance in determining the "monthly expense amounts specified under

9

the National Standards and Local Standards" that "shall be" included in a debtor's monthly expenses, the debtor must choose the "applicable" amount specified.

A grammatical reading of the statute requires an interpretation that "applicable" modifies "amount specified," not "monthly expense," which itself is used as an adjective also modifying "amount specified." *See In re Chamberlain*, 2007 WL 1355894 at *3, 2007 Bankr. LEXIS 1529 at *12 (finding that "'applicable' is an adjective that modifies the 'amounts specified' in the Standards" rather than modifying "debtor's monthly expenses"). Reasoning that a debtor must have an applicable *expense* in order to be entitled to the ownership deduction requires that "*applicable*" modify "monthly expenses." The sentence structure of the statute employed by Congress does not support such a reading. If Congress had intended that the deduction be limited to debtors who have an applicable *expense,* it would have written 707(b)(2)(A)(ii)(I) to read, "The debtor's monthly expenses shall be the debtor's applicable monthly expense*s in the* amounts specified under the National Standards and Local Standards . . ." rather than "The debtor's monthly expenses shall be the debtor's applicable monthly expense amounts specified under the National and Local Standards . . . ."

The only basis for finding which amount specified in the Standards is "applicable" to a debtor is the various categories under which the amounts are set forth. Thus, the court agrees with those courts that have found that, in determining a debtor's vehicle ownership expense, "applicable" refers to the number of cars owned by the debtor. "If the debtor has only one car, the 'applicable' expense is the one found in the first column [of the Standard for Ownership Costs]," and if a debtor has a second vehicle, the amount in the second column is also "applicable." *Id.* (finding that "it takes a tortured reading to make 'applicable' refer to anything else").

The disposition required by the plain language of the statute is not "absurd" and is not "demonstrably at odds with the intentions of the drafters." *See Ron Pair Enterprises, Inc.*, 489 U.S. at 242-43 (internal citations omitted); *In re Sawdy*, 2007 WL 582535 at *6-9, 11-12 (discussing the various rationales used in interpreting § 707(b)(2)(A)(ii)(I) and concluding that arguments exist under both the "unfair" result rationale and policy interests to support either interpretation of the statute). As one court observed, "the means test is a 'blind legislative formula' serving to determine, under an objective standard whether the Court must presume that a filing is abusive." *In re Wilson*, 356 B.R. at 120 (internal citation omitted). Congressional policy is implemented not only by application of the means test under § 707(b)(2)(A) but also by application of the § 707(b)(2)(B) provisions relating to rebuttal of any presumption and § 707(b)(3), under which the court may consider the totality of a debtor's actual financial circumstances, *In re*

*Mestemaker*, 359 B.R. 849, 854-55 (Bankr. N.D. Ohio 2007). Thus, the court believes its interpretation will not result in an application that is contrary to Congressional intent.

### B. IRS Guidelines Have No Application to the Means Test

While the plain language of § 707(b)(2)(A)(ii)(I) refers only to the IRS Standards, which are published as separate and distinct tables, and makes no reference to the Internal Revenue Manual, which contains guidelines for the IRS's use of the Standards, there are several additional reasons that further support the court's rejection of any interpretation based on the IRS guidelines.

First, the Standards that the statute refers to make no reference to the IRS guidelines and do not condition the ownership expense deduction on the existence of loan or lease payments or secured debt payments.

Second, as several courts have noted, the Local Standards are used very differently by the IRS as compared to their use under § 707(b)(2)(A)(ii)(I). *See, e.g., In re Fowler*, 349 B.R. at 418; *In re Hartwick*, 352 B.R. at 869. The IRS guidelines use the Local Standards as a cap: "Taxpayers will be allowed the local standard or the amount actually paid, whichever is less." Fin'l Analysis Handbook, ¶¶ 5.15.1.7(4). The statute, on the other hand, does not limit the deduction to the lesser of the two amounts but instead provides that the debtor's monthly expense "shall be" the amount specified in the Standards. The error in the logic of applying the IRS guideline requiring a debtor to have an actual car payment is thus apparent. As explained by Judge Wedoff:

> The language quoted from the [Internal Revenue Manual] states that if the debtor makes no car payments, the ownership expense amount may not be claimed. Indeed, this result follows necessarily from the [Internal Revenue Manual's] treatment of the Local Standards as caps on actual expenditure: if a taxpayer has no car payments, the taxpayer obviously cannot claim a Local Standard amount intended to cap actual car payment expenses.

Eugene Wedoff, *Means Testing in the New § 707(b)*, 79 Am. Bankr. L.J. 231, 257 (Spring, 2005). However, "since the means test treats the Local Standards not as caps but as fixed allowances," the IRS guideline is simply inapplicable. *See id.* at 257-58. The IRS guidelines reflect IRS policy relating to collection of tax debts, not Congressional policy under the bankruptcy means test. As one court correctly notes, even IRS directs debtors who are calculating expense amounts under the means test away from its own guidelines and to the website of the UST, which does not contain the IRS guidelines. *In re Wilson*, 356 B.R. at 120 (citing Fin'l Analysis Handbook, pt. 5, ch. 15, exh. 5.15..1-2 which directs individuals to the IRS web-based tables of expense standards, which in turn provide as follows: "Disclaimer: IRS Allowable Expenses are intended for use in calculating repayment of delinquent taxes. Expense information for use in bankruptcy calculations

can be found on the website for the U.S. Trustee Program").

Third, there is no basis for a court to defer to IRS's administrative expertise since it is not an administrative agency that administers the Bankruptcy Code. *In re Chamberlain*, 2007 WL 1355894 at *4, 2007 Bankr. LEXIS 1529 at *14; *see also Chevron U.S.A., Inc. v. Nat'l Res Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984) (noting, on review of an agency's construction of a statute which it administers, that "[t]he judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent"). Furthermore, while the Internal Revenue Manual provided a model that Congress could easily have adopted if that were its intent, it did not do so.

Finally, although the court rests its statutory interpretation on the language of the statute, the legislative history of the statute evidences that Congress did not intend to include the IRS guidelines found in the Internal Revenue Manual's Financial Analysis Handbook in determining a debtor's monthly expense deductions under the means test. As the court in *Fowler* explained:

> A prior version of the BAPCPA which was never passed defined "projected monthly net income" for the means test to require a calculation of expenses as follows:
>
> (A) the expense allowances under the applicable National Standards, Local Standards, and Other Necessary Expenses allowance (excluding payments for debts) for the debtor ... in the area in which the debtor resides *as determined under* the Internal Revenue Service financial analysis for expenses in effect as of the date of the order for relief.
>
> H.R. 3150, 105th Congress (1998) (emphasis added). The reference to the Internal Revenue Service financial analysis was replaced by the language currently in section 707(b)(2)(A) which simply states that a debtor gets the "applicable monthly expense amounts specified under the National and Local Standards." 11 U.S.C. § 707(b)(2)(A)(ii)(I).
>
> The change from the prior version evidences Congress' intent that the Courts not be bound by the financial analysis contained in the IRM and lends credence to the Court's conclusion that it should look only to the amounts set forth in the Local Standards. *See, e.g., Transcontinental & Western Air, Inc. v. Civil Aeronautics Bd.*, 336 U.S. 601, 606, 69 S.Ct. 756, 93 L.Ed. 911 (1949) (relying on legislative history to prior unenacted bill for clarification of language used in bill that was ultimately enacted); *Springfield Indus. Corp. v. United States*, 663 F.Supp. 128, 11 Ct. Int'l Trade 331, 338 (1987), rev'd on other grounds, 842 F.2d 1284 (Fed.Cir.1988) (acknowledging that "[s]ilence or lack of clarity at the point where crucial language is finally inserted can sometimes be clarified by [legislative] history, even from bills which did not pass in prior years" but ultimately holding that the legislative history was not helpful to illuminate the term because the enacted bill was too different from the prior version).

*In re Fowler*, 349 B.R. at 419 (emphasis added). Congress appears to have considered incorporating the IRS guidelines into the means test but chose not to do so.

Notwithstanding the court's analysis, even if the IRS guidelines were applicable in determining a debtor's entitlement to the ownership expense, Debtors would still be entitled to the deduction. The IRS guidelines require only that an individual have a car loan or lease payment. *See* Fin'l Analysis Handbook § 5.15.1.7(4)(B) ("If a taxpayer has no car payment only the operating cost portion of the transportation standard is used to figure the allowable transportation expense.") and § 5.15.1.9(B) ("If the taxpayer has no car payment, or no car. . . [t]he taxpayer is only allowed the operating cost or the cost of transportation."). There is no reference in either the statute, the Standards, or the IRS guidelines to secured debt payments as a requirement before the ownership deduction may be taken.

In this case, although Debtors own their vehicles free and clear of liens, the UST does not dispute the fact that Debtors incurred debt in order to purchase the Ford van and the Subaru and that they have not yet paid off that debt. The parties cite, and the court has found, no case presenting similar facts, that is, the debtor owns a vehicle free and clear of liens but has unpaid unsecured debt incurred for the purchase of the vehicle. One court that indicated it agreed with the line of cases that deny the ownership expense deduction if the debtor is not incurring expenses for the purchase or lease of a vehicle, permitted the deduction where the debtor did not own the vehicle and was not obligated on the note that was secured by the vehicle but was the primary user and made the monthly payment for the vehicle. *See In re Demonica*, 345 B.R. 895, 904-05 (Bankr. N.D. Ill. 2006). The court reasoned that the debtor was incurring an ownership expense to use the vehicle and, therefore, could claim the ownership expense deduction. *Id.* This case presents a stronger argument in favor of permitting the deduction in that Debtors own both vehicles and still owe debts for the purchase of the vehicles that were actually incurred by them. The court finds that even under the IRS guidelines, Debtors are entitled to the vehicle ownership deduction.

**IV. Does a Presumption of Abuse Arise in this Case?**

Debtors' means test calculations on Form B22A as filed show a negative $733 monthly disposable income. As explained above, Smith's business income is understated by $435 and Debtors are not entitled to the $202 deduction taken by them on Line 42 for debt secured by their vehicles. With these adjustments, Debtors' monthly disposable income is still a negative $96. Because, for all of the reasons discussed above, Debtors are entitled to the vehicle ownership expense deduction for both cars owned by them, their monthly disposable income for purposes of the means test remains a negative number and no presumption of abuse arises under § 707(b)(2). The UST's motion to dismiss based on § 707(b)(2) will be denied.

**V. Abuse Determination under § 707(b)(3)**

Before BAPCPA, courts considered whether to dismiss a case for "substantial abuse" under § 707(b)

13

based on the "totality of the circumstances." *See, e.g., In re Krohn*, 886 F.2d 123, 126 (6th Cir. 1989); *In re Price*, 353 F.3d 1135, 1139 (9th Cir. 2004). The Sixth Circuit explained that "substantial abuse" could be predicated upon either a lack of honesty or want of need, to be determined by the totality of the circumstances. *In re Krohn*, 886 F.2d at 126. Congress incorporated this judicially created construct in § 707(b)(3) by requiring a court to consider "(A) whether the debtor filed the petition in bad faith; or (B) the totality of the circumstances . . . of the debtor's financial situation demonstrates abuse." 11 U.S.C. § 707(b)(3)(A) and (B). Thus, pre-BAPCPA case law applying these concepts is still helpful in determining abuse under § 707(b)(3). The court emphasizes, however, that Congress has clearly lowered the standard for dismissal in changing the test from "substantial abuse" to "abuse."

The UST contends that "at the core" of his argument that granting Debtors relief in this case would be an abuse is Debtors' lack of honesty in completing their bankruptcy schedules and Form B22A. Specifically, the UST argues that Debtors acted dishonestly by including deductions on Form B22A for future payments on secured debt relating to their unencumbered vehicles, scheduling the debt incurred to purchase the vehicles as secured debt on Schedule D of their bankruptcy schedules, and including on Schedule J installment payments of $900 for the car debt.

In *Krohn*, the court explained that in determining whether to deny a debtor Chapter 7 relief, a court should ascertain "from the totality of the circumstances whether [the debtor] is merely seeking an advantage over his creditors, or instead is '"honest," in the sense that his relationship with his creditors has been marked by essentially honorable and undeceptive dealings. . . ." *In re Krohn*, 886 F.2d at 126. One factor to consider in this determination is the "debtor's good faith and candor in filing schedules and other documents." *Id.* While the inaccuracies relating to Debtors' reporting of debt owed on their unencumbered vehicles as secured debt are troubling, the court believes that Debtors communicated that they owed debts for the vehicles and relied on counsel to accurately complete their Schedules and Form B22A, with the natural assumption being that consumer debts for purchase of vehicles are secured. Debtors were careless in failing to note the inaccurate reporting. However, the court does not believe that reporting the debts as secured and Debtors' carelessness in that regard was designed to seek an advantage over their creditors. In fact, claiming a deduction for payments on secured debt on Form B22A made no difference in whether or not a presumption of abuse would arise.

The court is also concerned that predicating dismissal under § 707(b)(3) on schedule inaccuracies alone would conflict with the more stringent standard chosen by Congress in 11 U.S.C. § 727(a)(4) for denial of discharge based upon knowingly and fraudulently making a false oath in connection with a

14

Chapter 7 case. Denial of discharge under § 727(a)(4) requires the commencement of an adversary proceeding, which has not occurred. Fed. R. Bankr. P. 7001(4). Nor does the UST's proof regarding Debtors' schedule and Form B22A inaccuracies demonstrate by a preponderance of the evidence knowing *and* fraudulent falsehoods by Debtors.

Although the UST also argues that payments on the car debts should not be included on Debtors' Schedule J because the debts are unsecured debts, Debtors' Statement of Intention indicates that they intended to reaffirm both of those debts. Payments on debt a debtor intends to reaffirm are properly included on Schedule J. Although Debtors had no uniform monthly car payment, having promised to pay "as much as possible, as soon as possible," scheduling a total of $900 to be paid monthly on the two debts reflects only Debtors' desire to repay the debt to family members rather than an attempt to seek an advantage over their creditors. *Cf.* 11 U.S.C. § 524(f)(debtors not prohibited from voluntarily repaying debts).

The UST also argues that the totality of the circumstances show that Debtors have the ability to repay their unsecured creditors. Factors relevant to determining whether a debtor is "needy" include the ability to repay debts out of future earnings, which alone is sufficient to warrant dismissal. *Krohn*, 886 F.2d at 126. Other factors include "whether the debtor enjoys a stable source of future income, whether he is eligible for adjustment of his debts through Chapter 13 of the Bankruptcy Code, whether there are state remedies with the potential to ease his financial predicament, the degree of relief obtainable through private negotiations, and whether his expenses can be reduced significantly without depriving him of adequate food, clothing, shelter and other necessities." *Id.* at 126-27. "Courts generally evaluate as a component of a debtor's ability to pay whether there would be sufficient income in excess of reasonably necessary expenses to fund a Chapter 13 plan." *Mestemaker*, 359 B.R at 856 (citing *In re Behlke*, 358 F.3d 429, 435 (6th Cir. 2004)).

Debtors have had to borrow money from family members to acquire vehicles to meet their basic transportation needs. They have had their home foreclosed upon, some vehicles repossessed and experienced garnishment proceedings. They are facing collection actions by taxing authorities. Against this tableau of family financial disaster, the UST argues only that the $900 monthly car payment listed on Schedule J could be used to pay unsecured creditors. While something less could be a proper Schedule J expense based on Mr. Smith's testimony, the court agrees that this claimed $900 amount is neither an actual nor a reasonably necessary monthly expense amount even if Debtors reaffirm the car debts. Excluding this $900 expense amount leaves Debtors approximately $700 per month over and above their other Schedule

J expenses, which expenses the UST does not challenge. Nevertheless, in addition to unsecured nonpriority debt in the amount of $165,472, Debtors owe nondischargeable unsecured priority tax debt in the amount of $58,800. In order to fund a plan confirmable under either Chapter 13 or Chapter 11, Debtors would be required to commit $980 per month to provide for payment of their priority tax debt alone. *See* 11 U.S.C. §§ 1322(a)(2) and 1129(a)(9)(C). Debtors do not have the ability to do so. Although Debtors have relatively stable income, there is no evidence that their income is likely to increase by any significant amount. Thus there would be no benefit whatsoever to Debtors' general unsecured creditors to a Chapter 13 proceeding. *Cf. In re Skvorecz*, Case No. 06-12278 ABC, 2007 WL 1378348, 2007 Bankr. LEXIS 1572 (Bankr. D. Colo. May 8, 2007). Moreover, the priority tax creditors that would be the only beneficiaries of a plan if it could be confirmed have non-dischargeable debts upon which they can continue to pursue collection actions against Debtors after a Chapter 7 discharge. *See* 11 U.S.C. § 523(a)(1). Indeed the taxing authorities' debt collection efforts against Debtors outside of bankruptcy will likely be enhanced by a Chapter 7 discharge. Debtors do not have sufficient income in excess of reasonably necessary expenses to fund either a Chapter 13 or Chapter 11 plan.

The court finds that the totality of the circumstances of Debtors' financial situation do not show that it would be an abuse of the provisions of Chapter 7 for them to obtain relief in the form of a discharge under § 727. The UST's motion to dismiss based on § 707(b)(3) will also be denied.

The court will enter a separate order in accordance with this memorandum of decision.